**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 2 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JIYAN AN,

      Plaintiff-Appellant,

v.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, doing business as Los
Alamos National Laboratory;
MORTON BRADBURY; JOHN
FOLEY,

      Defendants-Appellees.

No. 01-2223
(D. New Mexico)
(D.Ct. No. CIV-00-147-JP/WWD)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **BALDOCK**, and **O'BRIEN**, Circuit Judges.

Ms. Jiyan An appeals the district court's grant of summary judgment

dismissing her claims under Title VII of the Civil Rights Act against her former

employer, Regents of the University of California, d/b/a Los Alamos National

Laboratory ("Los Alamos"), and her state law claims against two individual Los

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Alamos employees, Mr. Morton Bradbury, Life Sciences Division Director, and Mr. John Foley, Human Resources Case Coordinator. The district court found An failed to establish a genuine issue of material fact as to Los Alamos's alleged vicarious liability or negligence. Therefore, the district court granted summary judgment to Los Alamos on An's federal claims and dismissed her remaining state claims without prejudice. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## Background

An contracted to work for Los Alamos as a Graduate Research Assistant in the Life Sciences Division commencing March 17, 1997. Because that job classification required current enrollment in a graduate program and An was not so enrolled, she was reclassified in May 1997 as an "Under Graduate Student Post-Baccalaureate Tech." (Appellant's App. Vol. I at 100-01.) This position required acceptance and enrollment in a graduate program within one year of the change in appointment. Both job classifications involved a one-year contract with the possibility of a one-year renewal.

An was assigned to assist Mr. Robert Cary, a research project supervisor. An and Cary became friendly, often lunching together. As the friendship blossomed, Cary discussed his marital problems and sexual experiences with An, and compared his wife's physical attributes to An's. An alleges these

-2-

conversations made her uncomfortable, but she did not complain to Cary or report the conversations or her concerns to anyone at work.

An claims Cary forcibly raped her in June 1997, but again, she did not report the encounter, allegedly due to shame and fear of losing her husband and job. This event launched a sexual relationship that continued unreported through March 1998. An asserts Carey forced his attentions on her and promised long-term employment if she remained silent about their relationship.

The relationship was briefly interrupted, however, when An's husband discovered An and Cary together at the Ans' apartment in mid-November 1997. This discovery prompted Mr. An to telephone David Chen, the group leader of the research project, late that night. Mr. An reported the incident to Chen, stating his wife was either having an affair or was being subjected to "something like sexual harassment." (Chen Dep. at 45; Appellant's App. Vol. II at 292.) Chen advised Mr. An to ask his wife to either talk with Chen when he returned from vacation (scheduled to begin the next morning) or to e-mail him.

An did not contact Chen. Instead she and her husband went to the human resources office and reported the apartment incident to Foley. The couple told Foley about Cary's inappropriate comments and also complained that Cary shut his office door when An made her reports to him; she did not reveal the sexual relationship. After a brief investigation, Foley forwarded the matter to Bradbury,

the Life Sciences Division Director.

The Ans then met with Bradbury and his deputy director. After fifteen to twenty minutes, they were joined by Cary. At that meeting, the Ans reiterated the complaints made to Foley, but An specifically denied any sexual relationship with Cary. An requested an apology from Cary and a transfer to a different work group. Although she received the apology, the managers determined she should continue working with Cary. However, they required he 1) refrain from requesting An work after-hours, 2) conduct all meetings with An in the open, and 3) not engage in personal conversations with her. An agreed to this arrangement, and on at least two occasions after this meeting assured the deputy director that she was "okay." (An Dep. at 149; Appellant's App. Vol. I at 117.)

An also had a private meeting with Chen on his return from vacation. She again denied any sexual relationship with Cary, apologized for her husband's call, and requested a change of supervisor because her husband was jealous. Chen agreed to be her formal supervisor, but they mutually agreed An would continue to report to Cary.

No further complaints were brought to management's attention until An formally complained to the human resources office on March 26, 1998. At that

time she disclosed her unwanted sexual relationship.[1]  Cary admitted the affair to Chen, but asserted it was consensual.  Cary was immediately placed on investigatory leave and later placed on unpaid suspension.  He was required to undergo sexual harassment prevention training and was prohibited from supervising female employees for two years.  A letter of reprimand was placed in his file.

An's employment was extended beyond the original one-year contract.  At her request, Bradbury transferred her to another division, the Chemical Sciences and Technology Division, in July 1998.  Her benefits, salary and working conditions were unchanged.  In March 1999, An was notified of her dismissal from this division because she lacked the expertise for the project.  She was placed in a pool of students for assignment to another project.  However, because she still had not been accepted into a graduate program, as required for her job, she was terminated in May 1999.  An did not seek another position with Los Alamos, but instead moved to Virginia.

An filed suit against Los Alamos, Foley, Bradbury, and other defendants, including Cary.  After the claims against the other defendants were settled or dismissed, Los Alamos, Bradbury, and Foley filed motions for summary judgment

_____

[1] It is uncontested that An's disclosure closely followed Mr. Cary's announcement that his wife was pregnant and Ms. An's responding threat to call his wife and tell her about the affair.

-5-

to resolve An's claims of vicarious and direct liability for Title VII violations and the state law claims. Following the district court's summary judgment order and dismissal of the remaining state claims without prejudice, An filed this appeal.

Standard of Review

We review a grant of summary judgment de novo, applying the same legal standard as that employed by the district court. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002). It is only suitable to grant summary judgment when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Los Alamos, Foley and Bradbury have the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If successful, the burden then shifts to An to produce evidence substantiating a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). When reviewing summary judgment, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Okla., ex rel., Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied,* 528 U.S. 815 (1999). Applying this standard, there are no genuine issues of material fact concerning An's Title VII claims and Los Alamos is entitled to judgment as a matter of law.

Discussion

I.    Vicarious Liability

An contends the district court erred in finding no material issue of fact as to Los Alamos's vicarious liability for the actions of Cary. "An employer is subject to vicarious liability . . . for an actionable hostile environment created by a supervisor[2] with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). The imposition of vicarious liability is based on the relationship between the supervisor and the employer. Although "sexual harassment by a supervisor is not conduct within the scope of employment," *Burlington*, 524 U.S. at 757, it is an intentional tort in which the supervisor is "aided in accomplishing the tort by the existence of the agency relation." *Id.* at 759 (quoting Restatement (Second) of Agency § 219(2) (1957)). Thus, the plaintiff need not show the employer was negligent to establish the employer's vicarious liability.

Recognizing the potential hardship to employers in the unbounded application of this rule, the Supreme Court established an affirmative defense in *Burlington* and *Faragher* allowing an employer to avoid vicarious liability in

_____

[2] We assume without deciding, as did the district court, that Cary was An's supervisor.

-7-

certain situations. The ability to raise this defense, however, is predicated on the absence of a "tangible employment action" at the hands of the harassing supervisor. *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1024 (10th Cir.) (quoting *Faragher*, 524 U.S. at 807), *cert. denied,* 534 U.S. 1019 (2001). If no tangible employment action occurred, the employer can avoid liability if it shows by a preponderance of the evidence "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

A.    Tangible Employment Action

An claims the district court erred in determining she did not suffer a tangible employment action in this case. She alleges the following constitute tangible employment actions: (1) her job insecurity, (2) lack of promotion or employment term renewal, and (3) undesirable reassignment to the Chemical Sciences and Technology Division.

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" and "in most cases inflicts direct economic harm." *Burlington*, 524

U.S. at 761-62. It is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates," and is usually "documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 762. For example, in *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224 (10th Cir. 2000), a bank's loan supervisor promised job applicants he would provide leads and help them meet goals to qualify for bonuses. *Id.* at 1227. After they were hired, he conditioned the promised help upon them granting him sexual favors. *Id.* at 1229. When he was refused, he retaliated by withholding leads and disapproving many of their loans, making it impossible for them to meet their goals, attain eligibility for bonuses, and access their loan origination fee. *Id.* Because of the resulting economic injury, we held the victims had suffered a tangible employment action as a result of the sexual harassment. *Id.*

An contends the district court ignored case law when it found her job insecurity did not fit the definition of tangible employment action. She relies primarily on *Jeffries v. State of Kan.,* 147 F.3d 1220 (10th Cir.1998), and *Carney v. City of Shawnee*, 38 F.Supp.2d 905 (D. Kan. 1999). In *Jeffries*, this Court considered whether there had been adverse employment action taken by the employer, a necessary element of the plaintiff's retaliation claim. 147 F.3d at

1231.[3] "In recognition of the remedial nature of Title VII," the court held "the law in this circuit liberally defines adverse employment action." *Id*. at 1232. Rather than defining a set rule regarding what constitutes an "adverse employment action," we reaffirmed our "case-by-case approach to determining whether a given employment action is 'adverse.'" *Id.* (citing *Corneveaux v. CUNA Mut. Ins.*

---

[3] In its summary judgment order, the district court did not specifically address An's Title VII retaliation claim. However, we conclude there is no question as to whether the district court's order is a final decision on all matters as to all parties and causes of action. *See Dodge v. Cotter Corp.,* 328 F.3d 1212, 1221 (10th Cir.), *cert. denied,* 124 S. Ct. 533 (2003); *G.J.B. & Assoc., Inc. v. Singleton,* 913 F.2d 824, 827-28 (10th Cir. 1990). Count I of An's complaint, titled "Sexual Harassment and Retaliation in Violation of Title VII," included both her vicarious liability and retaliation allegations, identifying several allegations of "tangible employment actions" culminating in the adverse employment action of retaliatory termination. In the motion for summary judgment and in An's response, the Title VII claim was presented as one indistinct claim. Accordingly, the district court did not directly address An's termination specifically in the context of retaliation, but included it in the discussion granting summary judgment, as to the "Title VII claim, based on vicarious liability and employer negligence . . . ." It concluded An's appointment was not renewed (termination) "because the Plaintiff's 'background [did] not meet the programmatic needs of CST' . . . [and] the Plaintiff had not gained acceptance into a college graduate program as the . . . appointment required." Further, it found no evidence of pretext. *See Tran v. Tr. of the State Coll. in Colo.,* 2004 WL 119850 at **7-10 (10th Cir. Jan. 27, 2004) (No. 02-1048) (slip op.) (summary judgment for employer on retaliation claim appropriate when employer articulated a legitimate, non-retaliatory reason and no evidence supporting a reasonable inference of pretext). In dismissing An's Title VII claim, the district court specifically stated that the "only remaining claims" were the state claims, which were dismissed without prejudice. Because the district court found no facts to establish retaliation in the non-renewal of An's contract, we conclude that it effectively resolved all causes of action in its order granting summary judgment.

*Group,* 76 F.3d 1498, 1507 (10th Cir. 1996), and *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986-87 (10th Cir.1996)).

In *Carney*, following *Jeffries*, the district court concluded the plaintiffs sufficiently alleged harassment that "did affect a term, condition, or privilege of plaintiffs' employment . . . ." 38 F.Supp.2d at 908. They showed that noncompliance with their supervisor's sexual requests resulted in a threat of transfer from the detective unit to the patrol unit, a reassignment with significantly different responsibilities and benefits. Further, the *Carney* plaintiffs demonstrated transfers had been used in the past as a form of discipline. *Id.*

An's reliance on these cases is unavailing. We need not decide here whether a tangible employment action, precluding an affirmative defense, is equivalent to an adverse employment action, establishing a plaintiff's prima facie retaliation claim, because An's allegations do not meet even the most liberal definition of either of these terms. Her claim of job insecurity, unlike economic harm, is intangible and difficult to assess. *See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 244-45 (2d Cir. 2001) (holding supervisor's threats of discharge created an actionable hostile work environment, but not a tangible employment action). She claims "[w]hen she would not submit to [Mr. Cary's] demands, he appeared angry and criticized her work . . . ." (Appellant's Br. at 20.) Such allegations do not implicate the "official power of the enterprise," as intended in *Burlington*.

524 U.S. at 762. Cary's behavior would not be found in the official records of the company and certainly did not cause An economic harm. *Id.* at 761-62. Thus, An's subjective job insecurity does not rise to the level of tangible employment action.

Neither does her claim of a denial of promotion and job extension find support in the record. As to a promotion, she never applied for one, so a denial is unfeasible. As to the length of her tenure, An's one-year employment contract was extended beyond a second year and she was dismissed only for failing to gain acceptance into a graduate program, a known condition of her employment. Clearly, the termination of her employment was the consequence of her choice to forego graduate studies.

Finally, An argues, without supporting facts, that her reassignment to a division where her education was not beneficial was the prelude to her termination. However, it was she who requested a transfer; Bradbury simply acceded to her request. Her salary and benefits did not change, and her contractual employment term—one year with a possible one-year extension—was not shortened. *Id.* at 761. Consequently, all of An's claims of tangible employment action fail. Accordingly, we next consider the first prong of the *Burlington/Faragher* affirmative defense.

B.    Employer's Reasonable Prevention and Correction of Harassing Behavior

An maintains she established genuine issues of material fact regarding an institutional failure to exercise "reasonable care to prevent and correct promptly any sexually harassing behavior . . . ." *Faragher*, 524 U.S. at 807.  In evaluating this claim, we are encouraged to consider the employer's sexual harassment policy dissemination and enforcement.  *Id.*  Los Alamos's policy defined sexual harassment, gave examples of inappropriate conduct, and encouraged victims to report unacceptable incidents to supervisors or directly to the human resources department.  The policy was printed in administrative manuals, a sexual harassment booklet, and was included as part of all Los Alamos employees' training.  At the end of training, new employees were required to pass a test that often contained questions about sexual harassment.  In addition, an e-mail memo about the policy was sent to all employees shortly after An was hired.  She does not challenge these facts.  Thus, we conclude the sexual harassment policy and its dissemination generally evidence appropriate efforts to prevent sexual harassment.

Even so, An contends Los Alamos's specific actions were unreasonable because it failed to:  (1) discuss her concerns in private, outside of her husband's presence; (2) neutrally counsel her regarding the filing of a formal complaint; and (3) follow its own policies.  She points to Los Alamos's practice when sexual

-13-

harassment complaints are filed to typically pair female employees with a female human resources representative. However, in this case, Foley met with An and her husband when they arrived together, without an appointment, and at a time when the majority of employees were out of the office. The Ans' unannounced arrival provided no opportunity to arrange an appointment with a female employee. Moreover, An did speak outside the presence of her husband when she met privately with Chen, and when management followed up with her on at least two separate occasions. Despite these opportunities, not only did she fail to reveal her sexual relationship with Cary, she expressly denied it. Finally, An contends Foley questioned the propriety of filing a formal sexual harassment complaint against Cary during their initial meeting. However, Foley's single question is insufficient, on its own, to establish Los Alamos failed to enforce its sexual harassment policy.[4]

Similarly, Chen did not violate policy when he did not report Mr. An's telephone call or the apartment incident to the human resources department or to

---

[4] An further complains that her allegations should have been investigated by human resources personnel instead of Bradbury, who had little sexual harassment training. Again, this argument is unsupported by the facts. Foley conducted the initial investigation and compiled the facts as reported by individuals on both sides of the complaint. Pursuant to policy, he then forwarded his findings to Bradbury. As a result, An's complaint was investigated by human resources personnel, and a prompt and appropriate resolution was agreed upon by all parties.

his superiors. When Chen returned from vacation, he learned An and her husband had already reported the incident and reached an agreement with Los Alamos as to appropriate remedial action. Chen also spoke privately with An. She expressed no personal concerns, but indicated further action was necessary only because her husband was jealous. Given these unchallenged facts, there was no logical reason for Chen to mount a more rigorous response to An's complaint.[5]

Finally, An argues Los Alamos did not promptly respond to her initial complaint. Again, the facts contradict this claim. The apartment incident took place around November 19, 1997. An's husband spoke with Chen that night, the couple met with Foley the next week and with Bradbury and his assistant the following Wednesday, November 26. Thus, within ten working days from the time of the incident, all affected parties had agreed to remedial measures. This response was prompt, reasonable and proportionate to the information provided.

---

[5] An also alleges Chen should have known of the sexual harassment and taken action because a co-worker, Paige Pardington, told Chen she thought "something was going on" when two married individuals went to lunch together on several occasions. (Pardington Dep. at 46-47; Appellant's App. Vol. II at 289.) An's conclusion that this vague comment somehow triggered notice of sexual harassment is specious. Clairvoyance is not expected, and Los Alamos's sexual harassment policy quite reasonably does not require that every comment or suspicion be reported. *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) ("Vague, conclusory statements do not suffice to create a genuine issue of material fact.").

C.  Employee's Unreasonable Failure to Use Available Procedure

Los Alamos contends, and the district court agreed, that An failed to rebut the inference that her nine-month delay in reporting Cary's conduct was unreasonable. "[U]nreasonable failure to use any complaint procedure provided by the employer . . . will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 807-08.

An counters that her ten-month delay in divulging the sexual relationship does not conclusively establish her actions were unreasonable. She cites to *Burlington,* 524 U.S. at 748-49, where plaintiff did not report the offending conduct for a year, and *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 60 (1986), upholding a four-year delay as reasonable. We agree time alone is not dispositive, but distinguish these cases from An's circumstances. Unlike An, the employees in *Burlington* and *Meritor* did not deliberately mislead management by reporting lesser instances of sexual harassment and acquiesce in a resolution. *See Adler,* 144 F.3d at 675 (repeatedly assuring management that "everything [is] fine" will not support an inference of knowledge of sexual harassment). Her alleged fear that disclosure of the relationship would forfeit her family and her job is not sufficient to overcome these facts. "A generalized fear of retaliation does not excuse a failure to report sexual harassment." *Harrison*, 248 F.3d at 1026 (quotation marks and citation omitted). Even more so when the feared retaliation is not from the

employer, but from a third party such as An's husband. The district court correctly

concluded An failed to raise a material issue of fact as to whether she took

"reasonable care to avoid harm." *Faragher*, 524 U.S. at 807.

In sum, An has failed to present genuine issues as to any material fact

concerning vicarious liability for sexual harassment or retaliation under Title VII.

Accordingly, we affirm the grant of summary judgment on this issue.

II.     Direct Liability – Negligence

An also asserts Los Alamos is liable for sexual harassment under a theory of

negligence. An employer can be liable for Title VII sexual harassment engaged in

by its supervisor if its negligence caused the harassment. Employer negligence is

"failing to remedy or prevent a hostile or offensive work environment of which

management-level employees knew, or in the exercise of reasonable care should

have known." *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 577

(10th Cir. 1990) (quotation marks and citation omitted). We need spend little time

on this claim, as it requires a showing that after Los Alamos knew or should have

known of Cary's sexual harassment, it "failed to take prompt, adequate and

effective remedial action." *Jeffries*, 147 F.3d at 1229 (quotation marks and citation

omitted); *Adler*, 144 F.3d at 673. Los Alamos's response was prompt, as we

previously explained. It was also adequate and effective.

An employer will not be liable for information an employee purposefully

withholds from it. *Adler*, 144 F.3d at 675; *Faragher*, 524 U.S. at 806-07. As discussed above, An's initial complaint was limited to Cary's actions that made her feel uncomfortable. The mutually agreed-upon resolution included requirements that Cary apologize to An and her husband, that he cease inappropriate conversation, cease his closed-door practice, and cease scheduling overtime for An. Because An made no further complaint until March 1998, and in fact assured management that things were "okay" (An Dep. at 149; Appellant's App. Vol. I at 117), Los Alamos reasonably believed the remedial measures were adequate and effective. Similarly, the response to An's March 1998 complaint was also swift and final. Cary was immediately placed on unpaid leave pending the investigation, a written reprimand was placed in his personnel file, he was required to undergo sexual harassment training, and he was prohibited from supervising female employees for two years. There is no claim that any harassment continued after this date. Thus, Los Alamos's response to both complaints was prompt, adequate and effective. Because there are no genuine issues of material fact regarding An's negligence claim, we affirm the grant of summary judgment on this issue.

## Conclusion

The district court's grant of summary judgment on An's federal claims is **AFFIRMED**. The dismissal of the state law claims was also appropriate. *Bateman*

*v. City of W. Bountiful*, 89 F.3d 704, 709 n.5 (10th Cir. 1996).

**Entered by the Court:**

**TERRENCE L. O'BRIEN**
United States Circuit Judge